**EXHIBIT A**



## DECLARATION OF LEAD PLAINTIFF MOVANT

I, Robert Viccione, hereby declare as follows:

1. I hereby authorize the filing of a motion for appointment as lead plaintiff in the Optionable, Inc. ("Optionable") securities litigation;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter: None.

4. The following is a description of my transactions during the proposed class period (May 6, 2005 – May 11, 2007) in the common stock of Optionable:

| Security | Transaction Type | Number of Shares | Trade Date | Price Per Share ($) |
|---|---|---|---|---|

See attached.

5. I did not purchase shares of Optionable at the direction of my counsel or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July, 6    , 2007

Robert Viccione

| Name | Transaction Type | Trade Date | Shares / Par Value | Price per Share |
|---|---|---|---|---|
| Robert Viccione - Account 1 | Purchase | 02/23/07 | 1,000 | $7.8000 |
| | Purchase | 02/26/07 | 1,000 | $8.3800 |
| | Purchase | 02/26/07 | 1,000 | $8.3500 |
| | Purchase | 02/27/07 | 2,000 | $7.3900 |
| | Purchase | 02/27/07 | 2,000 | $7.3900 |
| | Purchase | 02/27/07 | 2,000 | $7.3900 |
| | Purchase | 03/20/07 | 2,000 | $5.3000 |
| | Purchase | 04/12/07 | 1,000 | $6.6100 |
| | Purchase | 04/16/07 | 200 | $6.2800 |
| | Purchase | 04/16/07 | 1,800 | $6.2900 |
| | Purchase | 04/19/07 | 500 | $6.3900 |
| | Purchase | 04/27/07 | 1,500 | $6.3800 |
| | Purchase | 04/27/07 | 200 | $5.6000 |
| | Purchase | 04/27/07 | 200 | $5.7200 |
| | Purchase | 04/27/07 | 2,300 | $5.7500 |
| | Purchase | 05/03/07 | 5,800 | $4.4400 |
| | Purchase | 05/09/07 | 200 | $3.0200 |
| | Purchase | 05/09/07 | 200 | $2.9400 |
| | Purchase | 05/09/07 | 200 | $3.1200 |
| | Purchase | 05/09/07 | 7,800 | $3.1300 |
| | | | | |
| | Sale | 02/23/07 | 1,000 | $8.0200 |
| | Sale | 02/26/07 | 1,000 | $8.8800 |
| | Sale | 02/26/07 | 1,000 | $8.8000 |
| | Sale | 04/11/07 | 1,000 | $7.1500 |
| | Sale | 04/11/07 | 1,000 | $6.8600 |
| | Sale | 04/11/07 | 1,000 | $6.7000 |
| | Sale | 04/11/07 | 1,000 | $6.7500 |
| | Sale | 04/13/07 | 1,000 | $7.0200 |
| | Sale | 04/16/07 | 2,000 | $6.3800 |
| | Sale | 04/26/07 | 200 | $6.7600 |
| | Sale | 04/26/07 | 300 | $6.7900 |
| | | | | |
| | | | | |
| Robert Viccione - Account 2 | Purchase | 04/27/07 | 200 | $5.7400 |
| | Purchase | 04/27/07 | 100 | $5.7500 |
| | Purchase | 05/08/07 | 160 | $4.7800 |
| | | | | |
| | | | | |
| Robert Viccione - Account 3 | Purchase | 04/27/07 | 300 | $5.8000 |
| | Purchase | 05/03/07 | 100 | $4.5500 |
| | | | | |
| | | | | |

**KAPLAN*FOX***

## DECLARATION OF LEAD PLAINTIFF MOVANT

I, James Lemsky, hereby declare as follows:

1. I hereby authorize the filing of a motion for appointment as lead plaintiff in the Optionable, Inc. ("Optionable") securities litigation;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter: None.

4. The following is a description of my transactions during the proposed class period (May 6, 2005 – May 11, 2007) in the common stock of Optionable:

| Security | Transaction Type | Number of Shares | Trade Date | Price Per Share ($) |
|----------|-----------------|------------------|------------|---------------------|

See attached.

5. I did not purchase shares of Optionable at the direction of my counsel or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _July 5_____, 2007

_____
James Lemsky

| Name | Transaction Type | Trade Date | Shares / Par Value | Price per Share |
|------|------------------|------------|-------------------:|----------------:|
| James Lemsky | Buy | 05/07/07 | 2,500 | $4.4100 |
| | Buy | 05/07/07 | 2,500 | $4.4100 |
| | Buy | 05/07/07 | 5,000 | $4.5100 |
| | Buy | 05/07/07 | 3,500 | $4.5100 |
| | Buy | 05/07/07 | 1,500 | $4.5000 |
| | Buy | 05/09/07 | 1,000 | $3.1900 |
| | Buy | 05/09/07 | 1,400 | $3.1700 |
| | Buy | 05/09/07 | 4,500 | $3.1100 |
| | Buy | 05/09/07 | 500 | $3.1300 |
| | Buy | 05/09/07 | 5,000 | $3.1100 |
| | Buy | 05/09/07 | 1,100 | $3.2500 |
| | Buy | 05/09/07 | 1,500 | $3.2400 |
| | | | | |
| | Sell | 05/10/07 | 500 | $0.8600 |
| | Sell | 05/10/07 | 700 | $0.8800 |
| | Sell | 05/10/07 | 1,000 | $0.8700 |
| | Sell | 05/10/07 | 3,000 | $0.7900 |
| | Sell | 05/10/07 | 3,000 | $0.8000 |
| | Sell | 05/10/07 | 3,000 | $0.7550 |
| | Sell | 05/10/07 | 800 | $0.7600 |
| | Sell | 05/10/07 | 3,000 | $0.9700 |
| | Sell | 05/10/07 | 3,000 | $0.9600 |
| | Sell | 05/10/07 | 2,000 | $1.4200 |
| | | | | |
| | | | | |

## DECLARATION OF LEAD PLAINTIFF MOVANT

I, Neal H. Klein, hereby declare as follows:

1. I hereby authorize the filing of a motion for appointment as lead plaintiff in the Optionable, Inc. ("Optionable") securities litigation;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter: None.

4. The following is a description of my transactions during the proposed class period (May 6, 2005 – May 11, 2007) in the common stock of Optionable:

| Security | Transaction Type | Number of Shares | Trade Date | Price Per Share ($) |
|---|---|---|---|---|

See attached.

5. I did not purchase shares of Optionable at the direction of my counsel or in order to participate in any private action under the federal securities laws;

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 8, 2007

_____
Neal H. Klein

| Transaction Type | Trade Date | Shares / Par Value | Price per Share |
|---|---|---|---|
| Buy | 04/12/07 | 3,000 | $6.5300 |
| Buy | 04/16/07 | 3,000 | $6.3900 |
| Buy | 04/20/07 | 1,000 | $6.4500 |
| Buy | 04/23/07 | 2,000 | $6.2300 |
| Buy | 04/30/07 | 3,000 | $5.8450 |
| Buy | 04/30/07 | 1,000 | $5.7400 |
| Buy | 04/30/07 | 2,000 | $5.4200 |
| Buy | 04/30/07 | 2,000 | $5.3700 |
| Buy | 05/01/07 | 3,000 | $5.3100 |
| Buy | 05/01/07 | 1,000 | $5.1700 |
| Buy | 05/09/07 | 2,000 | $3.0175 |
| | | | |
| Sell | 04/12/07 | 3,000 | $6.7200 |
| Sell | 04/25/07 | 2,000 | $6.3700 |
| Sell | 04/26/07 | 3,000 | $6.6800 |
| Sell | 04/30/07 | 1,000 | $5.7500 |
| Sell | 04/30/07 | 2,000 | $5.8700 |
| Sell | 05/02/07 | 500 | $6.0100 |
| | | | |
| | | | |

**EXHIBIT B**

| Name | Transaction Type | Trade Date | Shares / Par Value | Price per Share | Total Cost / Proceeds | Estimated Losses |
|---|---|---|---|---|---|---|
| **OPTIONABLE, INC. (OPBL)** Class period: 5/6/05-5/14/07 Robert Viccione's Estimated Losses | | | | | | |
| Robert Viccione - Account 1 | Purchase | 02/23/07 | 1,000 | $7.8000 | $7,800.00 | |
| | Purchase | 02/26/07 | 1,000 | $8.3800 | $8,380.00 | |
| | Purchase | 02/26/07 | 1,000 | $8.3500 | $8,350.00 | |
| | Purchase | 02/27/07 | 2,000 | $7.3900 | $14,780.00 | |
| | Purchase | 02/27/07 | 2,000 | $7.3900 | $14,780.00 | |
| | Purchase | 02/27/07 | 2,000 | $7.3900 | $14,780.00 | |
| | Purchase | 03/20/07 | 2,000 | $5.3000 | $10,600.00 | |
| | Purchase | 04/12/07 | 1,000 | $6.6100 | $6,610.00 | |
| | Purchase | 04/16/07 | 200 | $6.2800 | $1,256.00 | |
| | Purchase | 04/16/07 | 1,800 | $6.2900 | $11,322.00 | |
| | Purchase | 04/19/07 | 500 | $6.3900 | $3,195.00 | |
| | Purchase | 04/27/07 | 1,500 | $6.3800 | $9,570.00 | |
| | Purchase | 04/27/07 | 200 | $5.6000 | $1,120.00 | |
| | Purchase | 04/27/07 | 200 | $5.7200 | $1,144.00 | |
| | Purchase | 04/27/07 | 2,300 | $5.7500 | $13,225.00 | |
| | Purchase | 05/03/07 | 5,800 | $4.4400 | $25,752.00 | |
| | Purchase | 05/09/07 | 200 | $3.0200 | $604.00 | |
| | Purchase | 05/09/07 | 200 | $2.9400 | $588.00 | |
| | Purchase | 05/09/07 | 200 | $3.1200 | $624.00 | |
| | Purchase | 05/09/07 | 7,800 | $3.1300 | $24,414.00 | |
| | | | *32,900* | | *$178,894.00* | |
| | | | | | | |
| | Sale | 02/23/07 | 1,000 | $8.0200 | $8,020.00 | |
| | Sale | 02/26/07 | 1,000 | $8.8800 | $8,880.00 | |
| | Sale | 02/26/07 | 1,000 | $8.8000 | $8,800.00 | |
| | Sale | 04/11/07 | 1,000 | $7.1500 | $7,150.00 | |
| | Sale | 04/11/07 | 1,000 | $6.8600 | $6,860.00 | |
| | Sale | 04/11/07 | 1,000 | $6.7000 | $6,700.00 | |
| | Sale | 04/11/07 | 1,000 | $6.7500 | $6,750.00 | |
| | Sale | 04/13/07 | 1,000 | $7.0200 | $7,020.00 | |
| | Sale | 04/16/07 | 2,000 | $6.3800 | $12,760.00 | |
| | Sale | 04/26/07 | 200 | $6.7600 | $1,352.00 | |
| | Sale | 04/26/07 | 300 | $6.7900 | $2,037.00 | |
| | Sale | 05/14/07 | 10,000 | $0.5500 | $5,500.00 | |
| | Sale | 05/14/07 | 8,400 | $0.5350 | $4,494.00 | |
| | Retained* | | 4,000 | $0.4155 | $1,662.00 | |
| | | | *32,900* | | *$87,985.00* | $90,909.00 |
| | | | | | | |
| | | | | | | |
| Robert Viccione - Account 2 | Purchase | 05/08/07 | 160 | $4.7800 | $764.80 | |
| | Purchase | 04/27/07 | 200 | $5.7400 | $1,148.00 | |
| | Purchase | 04/27/07 | 100 | $5.7500 | $575.00 | |
| | | | *460* | | *$2,487.80* | |
| | | | | | | |
| | Retained* | | *460* | $0.4155 | *$191.13* | $2,296.67 |
| | | | | | | |
| | | | | | | |
| Robert Viccione - Account 3 | Purchase | 05/03/07 | 100 | $4.5500 | $455.00 | |
| | Purchase | 04/27/07 | 300 | $5.8000 | $1,740.00 | |
| | | | *400* | | *$2,195.00* | |
| | | | | | | |
| | Retained* | | *400* | $0.4155 | *$166.20* | $2,028.80 |
| | | | | | | |
| | | | | | | |
| | | | | **TOTAL estimated Viccione Losses** | | **$95,234.47** |
| | | | | | | |

* indicates average trading price of Optionable common stock from 5/15/2007 through 7/9/2007.

**OPTIONABLE, INC. (OPBL)**
**Class period: 5/6/05-5/14/07**
**Jim Lemsky's Estimated Losses**

| Name | Transaction Type | Trade Date | Shares / Par Value | Price per Share | Total Cost / Proceeds | Estimated Losses |
|---|---|---|---|---|---|---|
| Jim Lemsky | Buy | 05/07/07 | 2,500 | $4.4100 | $11,025.00 | |
| | Buy | 05/07/07 | 2,500 | $4.4100 | $11,025.00 | |
| | Buy | 05/07/07 | 5,000 | $4.5100 | $22,550.00 | |
| | Buy | 05/07/07 | 3,500 | $4.5100 | $15,785.00 | |
| | Buy | 05/07/07 | 1,500 | $4.5000 | $6,750.00 | |
| | Buy | 05/09/07 | 1,000 | $3.1900 | $3,190.00 | |
| | Buy | 05/09/07 | 1,400 | $3.1700 | $4,438.00 | |
| | Buy | 05/09/07 | 4,500 | $3.1100 | $13,995.00 | |
| | Buy | 05/09/07 | 500 | $3.1300 | $1,565.00 | |
| | Buy | 05/09/07 | 5,000 | $3.1100 | $15,550.00 | |
| | Buy | 05/09/07 | 1,100 | $3.2500 | $3,575.00 | |
| | Buy | 05/09/07 | 1,500 | $3.2400 | $4,860.00 | |
| | | | 30,000 | | $114,308.00 | |
| | | | | | | |
| | Sell | 05/10/07 | 500 | $0.8600 | $430.00 | |
| | Sell | 05/10/07 | 700 | $0.8800 | $616.00 | |
| | Sell | 05/10/07 | 1,000 | $0.8700 | $870.00 | |
| | Sell | 05/10/07 | 3,000 | $0.7900 | $2,370.00 | |
| | Sell | 05/10/07 | 3,000 | $0.8000 | $2,400.00 | |
| | Sell | 05/10/07 | 3,000 | $0.7550 | $2,265.00 | |
| | Sell | 05/10/07 | 800 | $0.7600 | $608.00 | |
| | Sell | 05/10/07 | 3,000 | $0.9700 | $2,910.00 | |
| | Sell | 05/10/07 | 3,000 | $0.9600 | $2,880.00 | |
| | Sell | 05/10/07 | 2,000 | $1.4200 | $2,840.00 | |
| | Sell | 05/17/07 | 2,500 | $0.6700 | $1,675.00 | |
| | Sell | 05/17/07 | 2,500 | $0.6780 | $1,695.00 | |
| | Sell | 05/17/07 | 5,000 | $0.6710 | $3,355.00 | |
| | | | 30,000 | | $24,914.00 | $89,394.00 |
| | | | | | | |
| | | | | | | |

| | | | | | OPTIONABLE, INC. (OPBL) | |
| | | | | | Class period: 5/6/05-5/14/07 | |
| | | | | | Neil Klein's Estimated Losses | |
| Name | Transaction Type | Trade Date | Shares / Par Value | Price per Share | Total Cost / Proceeds | Estimated Losses |
|---|---|---|---|---|---|---|
| Neil Klein | Buy | 04/12/07 | 3,000 | $6.5300 | $19,590.00 | |
| | Buy | 04/16/07 | 3,000 | $6.3900 | $19,170.00 | |
| | Buy | 04/20/07 | 1,000 | $6.4500 | $6,450.00 | |
| | Buy | 04/23/07 | 2,000 | $6.2300 | $12,460.00 | |
| | Buy | 04/30/07 | 3,000 | $5.8450 | $17,535.00 | |
| | Buy | 04/30/07 | 1,000 | $5.7400 | $5,740.00 | |
| | Buy | 04/30/07 | 2,000 | $5.4200 | $10,840.00 | |
| | Buy | 04/30/07 | 2,000 | $5.3700 | $10,740.00 | |
| | Buy | 05/01/07 | 3,000 | $5.3100 | $15,930.00 | |
| | Buy | 05/01/07 | 1,000 | $5.1700 | $5,170.00 | |
| | Buy | 05/09/07 | 2,000 | $3.0175 | $6,035.00 | |
| | | | 23,000 | | $129,660.00 | |
| | | | | | | |
| | Sell | 04/12/07 | 3,000 | $6.7200 | $20,160.00 | |
| | Sell | 04/25/07 | 2,000 | $6.3700 | $12,740.00 | |
| | Sell | 04/26/07 | 3,000 | $6.6800 | $20,040.00 | |
| | Sell | 04/30/07 | 1,000 | $5.7500 | $5,750.00 | |
| | Sell | 04/30/07 | 2,000 | $5.8700 | $11,740.00 | |
| | Sell | 05/02/07 | 500 | $6.0100 | $3,005.00 | |
| | Retained* | | 11,500 | $0.4155 | $4,778.25 | |
| | | | 23,000 | | $78,213.25 | $51,446.75 |
| | | | | | | |

* indicates average trading price of Optionable common stock from 5/15/2007 through 7/9/2007.

**EXHIBIT C**

07 CV 3753

UNITED STATES DISTRICT COURT    JUDGE KAPLAN
SOUTHERN DISTRICT OF NEW YORK

```
                                          )
                                          )
                                          )
ALEXANDER FLEISS, Individually And        )    CIVIL ACTION NO.
On Behalf of All Others Similarly Situated,)
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )    CLASS ACTION COMPLAINT
                                          )    FOR VIOLATIONS OF
                                          )    FEDERAL SECURITIES LAWS
OPTIONABLE INC., MARK NORDLICHT,          )
KEVIN CASSIDY,  EDWARD J. O'CONNOR,        )
ALBERT HELMIG and  MARC-ANDRE             )
BOISSEAU                                  )
                    Defendants.           )
                                          )    JURY TRIAL DEMANDED
                                          )
                                          )
                                          )
                                          )
                                          )
```

RECEIVED
MAY 1 1 2007
U.S._____ N.Y.
CASHIERS

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of the purchasers of Optionable Inc. ("Optionable" or the "Company") common stock in or pursuant to the May 9, 2005 Public Offering ("IPO" or the "Offering") of 31.431 million shares of common stock, all of which shares were sold by Company insiders.

2.     Optionable, its entire Board of Directors, and its Chief Financial Officer are each charged with including, or allowing the inclusion of, materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of

1

the Securities Act of 1933. Specifically, defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and also each failed to reveal, at that time of the IPO, that : (i) two of the Company's four board members, including its Chairman, Mark Nordlicht, and its only purported independent director, Albert Helmig, were actually related parties and Board Members of an entity called Platinum Energy; (ii) that the Company's customer base was significantly more concentrated than Optionable reported, with Bank of Montreal ("BMO") directly connected to over 80% of the Company's revenues – well above the 20% to 30% reported; and (iii) that defendants had conspired with now-terminated Bank of Montreal brokers to provide trade data to BMO that was false, misleading, and designed to avoid reporting hundreds of millions of dollars in trading losses that would have necessarily curtailed BMO trading with and through Optionable.

3.      It was only beginning in late-April 2007 – after defendants engineered the sale of an additional $28.94 million of their personally held shares in a private transaction with NYMEX Holdings on April 10, 2007 – that the truth about Optionable began to be revealed. First, on April 30, 2007, BMO announced huge options-related losses, above $300 million, the disclosure of which also evidenced the magnitude of the Company's customer over-concentration and its reliance on BMO for virtually all of its revenues. Then, days later on May 10, 2007, after BMO suspended trading through Optionable, BMO revealed that it had received a report from private forensic accountants that revealed that Optionable and its own brokers, by then terminated, had conspired to under-report trading losses, in an effort to maintain trading and avoid accountability to BMO.

4.      Following the publication of these reports, along with revelations of the undisclosed relationship of half of the Company's Board members, shares of Optionable collapsed. As evidence of this, shares of Optionable fell from just under $5.00 per share on April 30, 2007 to just over $1.00 per share on May 10, 2007, a decline of almost 80% attributable to two trading days. Also, during

2

this period tens of millions of shares traded, hundreds of times the Company's average daily trading volume.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"). Jurisdiction is conferred by §22 of the Securities Act. Venue is proper pursuant to §22 of the Securities Act, as defendant Optionable and/or the Individual Defendants conduct business in, and the wrongful conduct took place in, this District.

## THE PARTIES

### Plaintiff

6.     Plaintiff **ALEXANDER FLEISS** purchased shares of Optionable  common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the May 2005 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendant

7.     Defendant **OPTIONABLE INC.**, is a Delaware Corporation with its principal executive offices located at 465 Columbus Avenue, Valhalla, NY 10595. According to its profile, Optionable provides services for the brokerage of energy derivatives to brokerage firms, financial institutions, energy traders, and hedge funds in the United States. The Company offers natural gas and other energy derivatives trading and brokerage services, OTC energy derivatives brokerage services, energy futures derivatives services, and services for lesser-used derivatives, such as

3

swaptions, and also provides voice brokerage and floor brokerage services at the New York Mercantile Exchange.

**Individual Defendants**

8.      The individuals identified as defendants in subparagraphs (a) - (e) below, are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement and joint Proxy-Prospectus, as alleged herein, as those statements were "group-published" information. The Individual Defendants include the following:

(a)      Defendant **MARK NORDLICHT** ("Nordlicht") was, at the time of the IPO and thereafter, Chairman of the Board of Directors of Optionable, until his sudden and unplanned departure from the Company in April 2007. Defendant Nordlicht signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the May 2005 IPO. Also in connection with this IPO, defendant Nordlicht sold over 1.86 million shares of his personally-held Optionable shares and, in connection with the sale to NYMEX Holdings, sold an additional 7.0 million shares of Optionable stock, then valued at over $18.83 million.[1]

(b)      Defendant **KEVIN CASSIDY** ("Cassidy") is Chief Executive Officer and Vice-Chairman of the Board of Directors of Optionable. Defendant Cassidy signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the May 2005 IPO. Also in connection with this IPO, defendant Cassidy or entities controlled by him or family members directly related to him, sold

---

1 Also, in connection with the May 2005 Offering, Jules Nordlicht, father of defendant Mark Nordlicht also liquidated over 2.19 million shares of Optionable, or 100% of his holdings in the Company

over 4.516 million shares of their personally-held Optionable shares (accounting for 100% of their reported holdings), and in connection with the sale to NYMEX Holdings sold an additional 1.905 million shares of Optionable stock, then valued at over $5.124 million.

     (c)     Defendant **EDWARD J. O'CONNOR** ("O'Connor") is and was President of the Company and a member of the Board of Directors of Optionable. Defendant O'Connor signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the May 2005 IPO. Also in connection with this IPO, defendant O'Connor or entities controlled by him or family members directly related to him, sold over 645,000 shares of his personally-held Optionable shares, and in connection with the sale to NYMEX Holdings sold an additional 1.853 million shares of Optionable stock, then valued at over $4.986 million.

     (d)     Defendant **ALBERT HELMIG** ("Helmig") was a member of the Board of Directors of Optionable. Defendant Helmig signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the May 2005 IPO. While it does not appear that defendant Helmig sold shares in the IPO or in connection with the NYMEX Holdings acquisition, it does now appear that defendant Helmig, the Company's only purported independent director, was also a member of the Board of Directors of Platinum Energy, an entity also founded and chaired by defendant Nordlicht. No disclosure of this material relationship was ever made by defendants in any SEC filing or Offering Statement.

     (e)     Defendant **MARC-ANDRE BOISSEAU** ("Boisseau") was and is Chief Financial Officer of the Company. Defendant Boisseau signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued

in connection with the May 2005 IPO.

## MATERIALLY FALSE & MISLEADING STATEMENTS
## IN THE REGISTRATION STATEMENT AND PROSPECTUS

9.    On or about May 9, 2005 Optionable filed with the SEC, pursuant to Form 424B3, an amended Proxy-Prospectus and Registration Statement in connection with the sale of over 31.431 million shares, all of which were sold directly to the public by Company insiders, in an initial offering. Unbeknownst to investors, this Prospectus issued in connection with the Optionable IPO was materially false and misleading and misstated material facts about the Company, including that: (i) two of the Company's four board members, including its Chairman, Mark Nordlicht, and its only purported independent director, Albert Helmig, were actually related parties and Board Members of an entity called Platinum Energy; (ii) that the Company's customer base was significantly more concentrated than Optionable reported, with Bank of Montreal directly connected to over 80% of its revenues, well above the 20% to 30% reported; and (iii) that defendants had conspired with now-terminated Bank of Montreal brokers to provide trade data to BMO that was false and misleading and designed to avoid reporting hundreds of millions of dollars in trading losses, that would necessarily have curtailed BMO trading with and through Optionable.

10.    Rather than disclose the truth about Optionable, at the time of the May 2005 Offering, defendants made materially false and misleading statements about the Company, including describing the business of the Company, in part, as follows:

**BUSINESS**

Generally, the nature and mechanics of our business is to inquire of our clients needs in the trade of energy options, swaps, and futures. Once we understand their needs: in the case of NYMEX futures or options, the trade is presented on the NYMEX through CES; and in the case of OTC swaps and options, we inquire of other clients whether they are interested in participating in such transaction. Once the counterparties agree on a certain trade, we match the counterparties and consummate

6

the trade by (i) in the case of a bilateral OTC trade, by confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared trade, by submitting such trade to an exchange.

Presently, OTC brokerage is facilitated by brokering trades between our clients via telephone and electronic messaging, often referred to as voice brokerage. By building a relationship with their customers, our brokers learn about their customers' interests and are able to insure that traders can focus on the opportunities their customers will want to exploit. We intend to combine traditional voice brokerage with electronic trading by offering a hybrid combination of voice and electronic transactions; customers will be able to move between voice and electronic trading with no loss in liquidity. They will be able to transact in the same markets, regardless of whether or not they entered orders electronically or through a broker We aim to provide a bridge between OTC options and electronic trading.

We generate revenues by charging commission fees based on the transactions we broker on behalf of our clients. We also receive incentives from the Intercontinental Exchange ("ICE") and the New York Mercantile Exchange ("NYMEX"). The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. Furthermore, we generate revenues from CES floor brokerage operations, which are commission fees based on transactions they broker on behalf of their clients. In return for such floor brokerage revenues from CES, we assume all associated expenses incurred by CES, including brokerage commissions paid by CES to its employees. We anticipate that revenues generated from OPEX services will be earned similarly to the method by which we generate revenues when providing voice-brokerage services.

11.    Describing the Company's Operations, the Prospectus also stated, in part, that:

**HOW WE OPERATE**

Our OTC brokerage operations are conducted from our Briarcliff Manor, New York, office and our floor operations are conducted from the floor of the New York Mercantile Exchange. We have five employees and one consultant, Kevin Cassidy, at the Briarcliff Manor location, and three employees at the NYMEX location who interact heavily with our existing and potential clients. Generally, the nature and mechanics of our business is to inquire of our clients needs in the trade of energy options, swaps, and futures. Once we understand their needs: in the case of NYMEX futures or options, the trade is presented on the NYMEX through CES; and in the case of OTC swaps and options, we inquire of other clients whether they are interested in participating in such transaction. Once the counterparties agree on a certain trade, we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, by confirming the details of the executed trade with

7

both counterparties or (ii) in the case of a cleared trade, by submitting such trade to an exchange.

We rely heavily on communication technology to interact with our clients, whether by phone, e-mail, and/or instant messaging. We anticipate that, in the future, we will further rely on Internet based communications for the operation of OPEX.

We keep abreast of conditions in the natural gas trading market by receiving information using a combination of technology, such as trading software, relevant business news from different wiring services and traditional broadcast as well as leveraging the presence of OPEX employees on the floor of the NYMEX.

12.     Regarding the Company's customer base, and its purported limited reliance on certain key customers, the Prospectus also stated, in part, the following:

**CUSTOMER CONCENTRATION**

One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003.

*   *   *

**Customer Concentration**

Two of the Company's customers accounted for approximately 10% and 4%, respectively of its revenues during 2004 and 18% and 11% respectively, of its revenues during 2003. The Company minimizes its customer concentration risks by diversifying its existing customer base.

13.     Regarding the Company's use of "mark-to-market" reporting and other key reporting and compliance issues, the Prospectus also stated that defendants carefully reviewed these assumptions and estimates to assure that they were in compliance with Generally Accepted Accounting Principles and conventions. As evidence of this, the Prospectus also stated, in part, the following:

**Use of Estimates**

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure

8

of contingent assets and liabilities at the date of the financial statements and the
reported amounts of revenues and expenses during the reporting periods. Significant
estimates made by management include, but are not limited to, the realization of
receivables...

14.    In addition to the foregoing, the Prospectus also stated the following about the

Company's Directors, defendants Nordlicht and Helmig:

The following is a brief account of the business experience of each of our directors
and executive officers during the past five years or more.

Mark Nordlicht: Mr. Nordlicht is a founder of the Company and has served as our
Chairman of the Board of Directors since 2000. Mr. Nordlicht has also been the
Managing Partner of the General Partner of **Platinum Partners** Value Arbitrage
Fund, a market-neutral hedge fund, since January 2003. Mr. Nordlicht also served as
Managing Partner of West End Capital from 1998 through 2002. In his various
positions, Mr. Nordlicht has been responsible for the oversight in all of our
operations. Mr. Nordlicht earned a BA degree from Yeshiva University in 1989.

* * *

Albert Helmig. Mr. Helmig was elected as a director in September 2004. Since 2000,
Mr. Helmig has been a principal of Gray House Consulting, a consulting firm to the
energy industry. From 1991 through 2000, Mr. Helmig held the following positions
with the New York Mercantile Exchange (NYMEX): Chairman or Vice Chairman of
over 20 committees, 1991-2000; Member of Board of Directors, 1991-2000; Member
of Executive Committee, 1993-2000; and Vice Chairman, 1998-2000. Mr. Helmig is
also on the Board of Directors of the International Precious Metals Institute, a
member of the International Advisory Committee Board, Energy Intelligence Group,
a member of the National Committee on US/China Relations, and a member of the
National Futures Association. Mr. Helmig earned a B.S. degree in Finance and
Economics from Philadelphia University.

15.    Soon after the filing of the May 2005 Prospectus, defendants also filed with the SEC,

pursuant to Form 10-QSB, a copy of the Company's interim quarterly financial report. In the 1Q:05

Form 10-QSB defendants reiterated many of the same materially false and misleading statements as

were contained in the Prospectus, including its purported "use of estimates", and also added

representations regarding the Company's purported "Controls and Procedures":

**Use of Estimates**

9

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates made by management include, but are not limited to, the realization of receivables. Actual results will differ from these estimates.

* * *

## ITEM 3. CONTROLS AND PROCEDURES

Our chief executive officer and our chief financial officer (the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures for our Company. Such officers have concluded (based upon their evaluations of these controls and procedures as of the end of the period covered by this report) that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in this report is recorded, processed, summarized, and reported in a timely manner.

The Certifying Officers have also indicated that there were no significant changes in our internal controls over financial reporting or other factors that could significantly affect such controls subsequent to the date of their evaluation, and there were no significant deficiencies and material weaknesses....

16.     Further supporting these statements and representations, the 1Q:05 Form 10-QSB also contained Certifications by defendants O'Connor and Biosseau that also stated that the Company maintained adequate internal controls, and that the statements in its SEC filings were true and accurate.   As evidence of this, these Certifications stated, in part, the following:

**CERTIFICATION PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Edward O'Connor, certify that:

1. I have reviewed this Quarterly Report on Form 10-QSB of Optionable, Inc. for the quarter ended March 31, 2005;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

10

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

> (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: May 26, 2005
/s/ *Edward O'Connor*

11

------------------------

Edward O'Connor
Chief Executive Officer

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, Marc-Andre Boisseau, certify that:

1. I have reviewed this Quarterly Report on Form 10-QSB of Optionable, Inc. for the quarter ended March 31, 2005;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: May 26, 2005
/s/ *Marc-Andre Boisseau*
-----------------------
Marc-Andre Boisseau
Chief Financial Officer

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-QSB of Optionable, Inc. (the "Company") for the quarter ended March 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350, to the best of the undersigned's knowledge and belief, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  May 26, 2005
/s/ *Edward O'Connor*
-----------------------
Edward O'Connor
Chief Executive Officer

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

13

In connection with the Quarterly Report on Form 10-QSB of Optionable, Inc. (the "Company") for the quarter ended March 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350, to the best of the undersigned's knowledge and belief, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  May 26, 2005
/s/ *Marc-Andre Boisseau*
-----------------------
Marc-Andre Boisseau
Chief Financial Officer

17.    Similar statements concerning the Company's purported controls and procedures, its assumptions and Certifications by its CEO and CFO were also contained in quarterly and year-end reports filed by defendants with the SEC on or about: 7/25/2005, 11/7/2005, 3/15/2006, 3/31/2006, 7/25/2006, 10/25/2006 and 5/1/2007.

18.    In addition, in the Company's year-end report for 2006, filed with the SEC on or about March 23, 2007, defendants repeated many of these statements, as evidenced in part by the following:

**CLIENT CONCENTRATION**

One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

* * *

**ITEM 8A. CONTROLS AND PROCEDURES**

Our Chief Executive Officer and Chief Financial Officer (collectively, the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures which include controls and procedures that are designed to ensure that information required to be disclosed in the reports which we file with or

14

submit to the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC. The Certifying Officers have evaluated these controls and procedures and they have concluded (based upon their evaluation of these controls and procedures as of the end of the period covered by this report) that our disclosure controls and procedures are effective to: i) ensure that information required to be disclosed by us in this report is accumulated and communicated to management, including our principal executive officers as appropriate, to allow timely decisions regarding required disclosure; and ii) ensure that information required to be disclosed in the reports which we file or submit with the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC.

The Certifying Officers have indicated that there were no changes in our internal controls which occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, and there were no corrective actions with regard to significant deficiencies and material weaknesses.

* * *

**Use of Estimates**

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates made by management include, but are not limited to, the realization of receivables. Actual results will differ from these estimates.

19.    In addition to the foregoing, the 2006 Form 10-K also contained a purported "Code of

Business" and "Code of Ethics" that assured investors of the following:

**Code of Business Conduct and Ethics**

We have adopted a Code of Business Conduct and Ethics to provide guiding principles to all of our employees. Our Code of Business Conduct and Ethics does not cover every issue that may arise, but it sets out basic principles to guide our employees and provides that all of our employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. Any employee which violates our Code of Business Conduct and Ethics will be subject to disciplinary action, up to an including termination of his or her employment. Generally, our Code of Business Conduct and Ethics provides guidelines regarding:

    o    compliance with laws, rules and regulations,

15

   o      conflicts of interest,

   o      insider trading,

   o      corporate opportunities,

   o      competition and fair dealing,

* * *

   o      record keeping,

   o      confidentiality,

   o      protection and proper use of company assets,

* * *

   o      reporting any illegal or unethical behavior, and

   o      compliance procedures.

In addition, we have also adopted a Code of Ethics for our Chief Executive Officer and Senior Financial Officers. In addition to our Code of Business Conduct and Ethics, our CEO and senior financial officers are also subject to specific policies regarding:

   o      disclosures made in our filings with the SEC,

   o      deficiencies in internal controls or fraud involving management or other employees who have a significant role in our financial reporting, disclosure or internal controls,

   o      conflicts of interests, and

   o      knowledge of material violations of securities or other laws, rules or regulations to which we are subject.

20.    The 2006 Form 10-K again contained purported Certifications by defendants Cassidy and Biosseau, as follows:

**CERTIFICATION PURSUANT TO SECTION 302**

16

**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kevin Cassidy, certify that:

1. I have reviewed this Annual Report on Form 10-KSB of the Company for the fiscal year ended December 31, 2006;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

17

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: March 23, 2007
/s/ Kevin Cassidy
Kevin Cassidy
Chief Executive Officer

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, Marc-Andre Boisseau, certify that:

1. I have reviewed this Annual Report on Form 10-KSB of the Company for the fiscal year ended December 31, 2006;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

18

(b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: March 23, 2007
/s/ *Marc-Andre Boisseau*
Marc-Andre Boisseau
Chief Financial Officer

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-KSB of Optionable, Inc. (the "Company") for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects,

19

the financial condition and results of operations of the Company.

Date: March 23, 2007
/s/ *Kevin Cassidy*
Kevin Cassidy
Chief Executive Officer

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-KSB of Optionable, Inc. (the "Company") for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 23, 2007
/s/ *Marc-Andre Boisseau*
Marc-Andre Boisseau
Chief Financial Officer

21.    Taking further advantage of the artificial inflation in the price of Optionable shares caused as a direct result of defendants' publication of materially false and misleading statements about the Company, in early January 2007 defendants arranged to sell an additional $28 million of their privately-held Optionable shares to NYMEX Holdings (which had itself recently gone public and which was then sitting on hundreds of millions of dollars in cash). This transaction was also described in the Company's 2006 Form 10-K:

> On January 22, 2007, we, Mark Nordlicht, our Chairman of the Board, Kevin Cassidy, our Vice Chairman and Chief Executive Officer, and Edward O'Connor, our President (collectively, the "Founding Stockholders"), and NYMEX Holdings, Inc. (the "Investor") entered into a binding term sheet (the "Term Sheet") pursuant to which Messrs. Nordlicht, Cassidy and O'Connor have agreed to sell 7,000,000,

20

1,491,448 and 1,800,000 shares, respectively, of our common stock, par value $0.0001 per share (the "Common Stock"), to the Investor. This aggregate of 10,291,448 shares (the "Purchased Shares") represents nineteen percent (19%) of the currently outstanding shares of Common Stock on a fully diluted basis (without giving effect to the warrant discussed below). The purchase price to be paid by the Investor for the Purchased Shares is $2.69 per share. Pursuant to the Term Sheet, we agreed to issue the warrant described below to the Investor, in consideration of the Investor's agreement to engage in certain joint marketing and cobranding activities and to provide hosting of our servers and assistance in joint technology development. In addition, the Investor and us agreed to certain arrangements with respect to OTC products which the Company clears through the clearing system.

The warrant to be issued by us (the "Warrant") will permit the Investor to purchase a number of shares of Common Stock sufficient to increase the Investor's ownership of the Company's Common Stock to an amount not to exceed 40% of our then outstanding Common Stock on a fully diluted basis, based on the assumption that the Investor has retained ownership of the Purchased Shares. The Warrant will be exercisable from time to time for a period of 18 months from the closing date of the transactions contemplated by the Term Sheet at an exercise price per share equal to $4.30 (the "Exercise Price"). The Warrant will not contain a cashless exercise feature. The Exercise Price will be subject to certain customary adjustments to protect against dilution.

22.    According to insider selling repots, these shares were sold on or about April 10, 2007,

as follows:

### INSIDER TRANSACTIONS REPORTED -

| Date | Insider | Shares | Type | Transaction | Value |
|------|---------|--------|------|-------------|-------|
| 10-Apr-07 | NYMEX HOLDINGS INC<br>Director | 10,758,886 | Direct | Statement of Ownership | N/A |
| 10-Apr-07 | CASSIDY KEVIN<br>Officer | 1,905,000 | Indirect | Sale at $2.69 per share. | $5,124,450 |
| 10-Apr-07 | OCONNOR EDWARD J<br>Officer | 1,853,886 | Indirect | Sale at $2.69 per share. | $4,986,953 |
| 10-Apr-07 | NORDLICHT MARK<br>Officer | 7,000,000 | Direct | Sale at $2.69 per share. | $18,830,000 |
| | **TOTAL:** | **10,758,886** | | | **$28,944,403** |

**The True Financial and Operational Condition of**

21

## Optionable is Belatedly Disclosed

23.     On April 30, 2007, news related to the Company began to surface that would

ultimately lead to the catastrophic decline in the price of Optionable shares.  That day, news first

reached the market that the Bank of Montreal had lost over $300 million from natural gas options

trading, the majority of which trades were placed with or through Optionable.  That day,

*TheStreet.com* reported, in part, the following:

> **BMO Financial's natural gas blowup could yet singe commodities broker Optionable.**
>
> BMO, also known as Bank of Montreal, admitted Friday that it lost more than $300 million on natural gas trades that went bad.
> Optionable, a Valhalla, N.Y., broker of energy options and derivatives trades to U.S. hedge funds and other financial institutions, said in a recent federal filing that BMO accounted for 24% of net revenue last year.
>
> But that figure could significantly understate the extent of Optionable's dependence on Bank of Montreal, its largest customer, for business.
>
> Optionable is in the business of finding so-called counterparties for energy trades -- meaning it matches buyers with sellers. The broker charges a commission to both parties.
>
> A spokesman says counterparty deals represent 75% of Optionable's trading revenue. In such transactions, revenue from any given party represents just half of the company's potential revenues. That's a key point in assessing Optionable's dependence on BMO.
>
> A look at Optionable filings from last year show that net revenue for 2006 was $16 million. Taking Optionable's 24% figure puts revenue from BMO at $3.8 million. That figure, in turn, represents 43% of the firm's $8.9 million in 2006 brokerage fees, according to filings with the Securities and Exchange Commission.
>
> But remember, there are two sides to any counterparty deal. So trading deals involving BMO appear to account for 86% of the firm's brokerage fees, even if half of those fees aren't actually from BMO itself.
>
> An external spokesman for Optionable agrees that BMO's impact is likely more than the 24% when factoring in counterparties. He says counterparty trading, in which Optionable gets paid on both sides, represents about three-quarters of its trading

22

revenues. Floor trading makes up the remainder, says the spokesman, declining to provide a further breakdown of Optionable's business with BMO on the floor trades. In floor trades, brokers are only paid once, by the exchange.

Toronto-based BMO, which has been one of the more aggressive energy trading banks of its size, has said that its losses will be recorded on pretax basis in the second quarter of its 2007 fiscal year.

Although BMO chief Bill Downe described the losses as unacceptable, he didn't indicate that BMO would halt its energy trading operation, which has been a lucrative one before its blowup.

Nonetheless, if BMO finds it necessary to pull back significantly, Optionable could face a need to diversify.

24.    While it was a surprise to most investors that BMO accounted for so much of Optionable's business when counterparty trades were factored, it was not until May 2, 2007 that shares of the Company began to precipitously decline after the Company announced the sudden and unscheduled departure of its Chairman, defendant Nordlicht. Following this announcement, which offered little or no explanation for his sudden departure, shares of the Company fell from $6.00 per share to $4.81 per share: a single day decline of almost 20%. That day over 5 million shares traded, which was many times the Company's average daily trading volume.

25.    While defendants did not make any statement accepting responsibility for the huge losses reported by Bank of Montreal, by May 9, 2007, BMO announced that it would suspend dealings with Optionable, effective immediately. At the same time, BMO also announced that it had suspended certain of its lead traders. In a report published that day, *TheStreet.com* reported on the BMO announcement as well as defendant Helmig's reaction, in part, as follows:

**BMO Move Bashes Optionable**

**BMO Financial has suspended its relationship with Optionable.**

In a statement on Tuesday, the Canadian bank said it is "suspending all of its business relationships" and "all derivatives trading through that firm, pending the

23

results of a full external review which is ongoing."

The move comes just over a week after the Toronto-based financial institution, also called Bank of Montreal, reported that its commodities trading operation took a hit of about $315 million to $404 million on wrong-way bets on natural gas options.

Wednesday's news sent Optionable shares plunging 41% on the bulletin board.

"Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisers," Optionable Chairman Albert Helmig said Wednesday in a press statement. "We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and execution services are and have been rendered appropriately, professionally and correctly."

A call to BMO CEO Bill Downe was directed to the company's press representatives, who did not immediately return a call for comment. A spokesman for Optionable declined to comment.

Canada's fourth largest bank, BMO said commodities traders involved in the natural gas losses are on leave pending an external review of its trading. It did not name names. Early reports pegged the bank's losses to BMO natural gas trader David Lee.

The announcement could be a big hit to Valhalla, N.Y.-based Optionable's business, which stated during a first-quarter earnings call that BMO represented 30% of its revenues. The electronic options trading operation has said it has been trying to wean itself from its dependence on one client, but even during Optionable's earnings call there was no indication that BMO would suspend its business with Optionable.

26.    Following the publication of these reports, Optionable traded a huge volume of shares – over 11 million – and the price of the Company's stock declined by almost 40%. Following the publication of the report that BMO would abandon Optionable, Company shares sank to $2.81 per share.

27.    It was only the following day, May 10, 2007, however, that investors learned the full truth about the Company, including that Optionable had seemingly conspired with the rogue BMO traders to prevent BMO from learning about the full scope of its losses by improperly marking

24

BMO's position well above the actual market.  That day, *The Financial Post* of Toronto reported, in

substantial part, the following:

### BMO moves on auditors' report: Auditors had 'never seen such a wide discrepancy in terms of pricing'

TORONTO -- The decision by Bill Downe, Bank of Montreal's new chief executive, to act decisively on its $350-million to $450-million natural-gas trading blunder was the result of a tough report from forensic auditors Deloitte and Touche LLP into the activity of BMO's former star commodities trader, David Lee, it emerged on Wednesday.

BMO engaged Deloitte in early February and received the final report in late April.

Deloitte found there had been "serious mismarking of the book of natural-gas options," said a source familiar with the report.

The forensic auditors indicated they had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market value, the source said.

The Deloitte report also indicated that some of the prices used in BMO's mismarked book of trades were provided by Valhalla, N.Y.-based brokerage Optionable Inc., the source said.

Based on the findings of the report, Mr. Downe went public with the losses. The CEO, who only took the reins at BMO in March, announced the losses on April 27 and spoke to banking analysts on a conference call the same day.

Mr. Downe said the bank has refined its method of estimating the value of its book and also blamed the losses on a drying up of liquidity and flattening out of natural gas prices.

BMO has also confirmed that Mr. Lee, the man at the centre of the money-losing trades, is on a leave of absence, along with Bob Moore, the bank's executive head of commodity products.

On Tuesday, BMO also said it has suspended its business relationship with Optionable.

Shares of the brokerage, which was dependent on Mr. Lee for as much as 30% of its revenue, have tumbled 60% since BMO announced the trading losses.

25

Sources close to Mr. Lee and Optionable say the BMO trader, widely regarded as the biggest natural-gas options trader in the market, had a close personal relationship with the senior management of Optionable, including Kevin Cassidy, the chief executive.

Meanwhile, the brokerage's new chairman, Albert Helmig, dismissed concerns about the loss of its biggest customer on Tuesday. "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place," Mr. Helmig said.

Optionable's stock price has soared from $1.34 six months ago to as high as $8.63 in February this year, when it was revealed the New York Mercantile Exchange (Nymex) -- one of the foremost commodities exchanges in the world -- had bought a 19% stake in the company.

However, there was more bad news for Optionable yesterday after the company filed a document with the U.S. Securities and Exchange Commission (SEC) indicating that its options trading platform, known as OPEX, is under threat from the Nymex's own electronic trading platform.

"The company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition," the Optionable statement said.

Mr. Helmig, a former vice-chairman of Nymex, -took over as Optionable's chairman last week following the resignation of Mark Nordlicht.

Mr. Nordlicht said his resignation was not linked to BMO's trading losses. Both Mr. Helmig and Mr. Nordlicht are also on the board of directors of Platinum Energy Resources Inc. an oil and gas business that uses hedge financing to profit from energy price volatility.

BMO is expected to provide further details concerning the trading losses on May 23, when it announces its results for the second quarter of 2007. The bank has said "a full external review" of the losses is ongoing.

28.     Following this report, shares of the Company again collapsed on huge volume. By mid-day, over 10 million shares traded, as Optionable shares fell to just above $1.00 per share, a decline of over 80% compared to its trading price prior to April 30, 2007, and a decline of over $8.00 per share compared to Optionable's trading high, reached in late February 2007.

26

29.     As investors realized after the publication of these belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the May 2005 IPO, and that continued to adversely impact the Company after that time, include, in part, the following:

(a)     At the time of the IPO, it was not true that defendant Helmig was an independent director; in fact, he was also a member of the Board of Platinum Energy, another entity owned and controlled by defendant Nordlicht, who served as Platinum's founder and Board Chairman. According to Platinum Energy's website, defendants Helmig and Nordlicht were both members of the Board of Platinum since its inception;

(b)     At the time of the IPO, as a result of defendants' inability to control or manage the Company, it was not true that Optionable maintained sufficient controls and procedures and it was not true that the Company had adopted reasonable assumptions and estimates; it had failed to properly record the value of BMO's position, and had continued to mislead Bank of Montreal so as to conceal hundreds of millions of dollars in options related losses, so as to sustain BMO's aggressive trading of natural gas contracts, all of which were being placed with or through Optionable;

(c)     At the time of the IPO, trading with BMO accounted for well over the reported 20% to 30% of Optionable's revenues, with BMO accountable for closer to 70% or 80% of all trades when counterparty trades were factored in; it was also not true that defendants were, or would foreseeably be, able to reduce this over-concentration.   As a result of the counterparty trading, which accounted for a material amount of Optionable's business with BMO, it was materially false and misleading to represent to investors that such changes were likely to occur;

(d)     At the time of the IPO, Optionable's control deficiencies were much more severe than revealed, and the Company did not even maintain the most minimum standards of good

27

Corporate Governance or controls and procedures, as required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(e)    At the time of the May 2005 Offering, defendants had *not* conducted an adequate due diligence investigation into Optionable, which would have revealed many of the issues, and which would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were ultimately sold or traded following the IPO.

## CAUSATION AND ECONOMIC LOSS

30.    In connection with the May 2005 Optionable IPO, defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus. These filings were essential in allowing defendants to complete the Initial Public Offering of over 31.43 million shares of their personally held Optionable shares, and was also essential in allowing defendants to sell another $38 million in Company stock to NYMEX Holdings on April 10, 2007 and to create a public market for trading in Company stock.

31.    After April 30, 2007, when defendants' prior misrepresentations and illegal and improper conduct began to be revealed and apparent to investors, shares of Optionable declined precipitously, evidence that the prior artificial inflation in the price of Company shares was had abated. As a result of their purchases of Optionable stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

28

32.    By improperly characterizing the Company's internal controls and procedures, its relationship with BMO and the relationship of certain of the directors of the Company, the defendants presented a misleading image of Optionable's business and future growth prospects. Within the IPO Prospectus and Registration Statement, defendants repeatedly emphasized the ability of the Company to properly manage the Company and to continue to diversify its customer base, despite the fact that these statements were false and materially misleading. These claims caused and maintained the artificial inflation in Optionable's stock at the time of the May 2005 IPO, and thereafter until the truth about the Company was ultimately revealed to investors.

33.    Defendants' false and materially misleading statements caused Optionable shares to trade at artificially inflated levels from the time of the IPO and thereafter until the truth about the Company was revealed, including that: (i) two of the Company's four board members, including its Chairman, Mark Nordlicht, and its only purported independent director, Albert Helmig, were actually related parties and Board Members of an entity called Platinum Energy; (ii) that its customer base was significantly more concentrated than Optionable reported, with Bank of Montreal directly connected to over 80% of its revenues, well above the 20% to 30% reported; and (iii) that defendants had conspired with now-terminated Bank of Montreal brokers to provide trade data to BMO that was false and misleading, and that was designed to avoid reporting hundreds of millions of dollars in trading losses which would have necessarily curtailed BMO trading with and through Optionable.

34.    These belated revelations also evidenced defendants' prior misrepresentation of Optionable's business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior

29

artificial inflation was immediately eliminated from Optionable's share price, and shareholders were damaged as a result of this related share price decline.

35.    The chart below evinces the sudden, material decline in the price of Optionable shares that immediately followed the belated disclosures reaching the market:



36.    In sum, as the truth about defendants' misrepresentations and illegal course of conduct became known to investors, and as the artificial inflation in the price of Optionable shares was eliminated, plaintiff and the other members of the Class were damaged, suffering an economic loss of as much as $8.00 per share.

37.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' misrepresentations and omissions being revealed to investors, and

the subsequent significant decline in the value of the Company's shares was also the direct result of

defendants' prior misstatements and omissions being revealed

## CLASS ACTION ALLEGATIONS

38.    This is a class action on behalf of all persons who purchased Optionable shares, or

traceable stock, pursuant to the May 2005 Registration Statement and Prospectus (the "Class"),

excluding defendants.  Class members are so numerous that joinder of all is impracticable.

39.    Common questions of law and fact predominate and include: (i) whether defendants

violated the Securities Act; (ii) whether the Optionable IPO Registration Statement and Prospectus

misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

40.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions

would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the

Class.  A class action is superior to other available methods for the fair and efficient adjudication of

this controversy.

## CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against
### All Defendants and §15 of the Securities Act Against Defendants

41.    Plaintiff incorporates each and every allegation above as if stated herein.

42.    The Individual Defendants each signed and or aided in the preparation and filing of

Optionable's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it

to investors.

43.    Each of the statements alleged herein relating to Optionable 's prospects and financial

results made in the May 2005 Prospectus and Registration Statement were false or misleading when

issued.  The true but concealed facts were that: (i) two of the Company's four board members,

31

including its Chairman, Mark Nordlicht, and its only purported independent director, Albert Helmig, were actually related parties and Board Members of an entity called Platinum Energy; (ii) that its customer base was significantly more concentrated than Optionable reported, with Bank of Montreal directly connected to over 80% of its revenues, well above the 20% to 30% reported; and (iii) that defendants had conspired with now terminated Bank of Montreal brokers to provide trade data to BMO that was false and misleading and designed to avoid reporting hundreds of millions of dollars in trading losses, that would have necessarily curtailed BMO trading with and through Optionable. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that all material information that is foreseeably likely to have a material effect on a registrant's results be disclosed.

44.    All defendants named in this Claim for Relief, with the exception of Optionable, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

45.    The officers and directors of Optionable who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement. By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

46.    By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act. Defendants, by reason of their stock ownership and

positions with Optionable, were controlling persons of Optionable and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 11, 2007

Kim E. Miller (KM-6996)
**KAHN GAUTHIER SWICK, LLC**
12 East 41th Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

- and -

Lewis S. Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

33